1   COREY EVANS, CA Bar No. 218789
    GENEVA PAGE, CA Bar No. 235633
2   EVANS & PAGE
3   One Market Street
    Spear Tower
4   Suite 3600
    San Francisco, C.A. 94105
5
6   KATHERINE A. MEYER, D.C. Bar No. 244301
    TANYA SANERIB, D.C. Bar No. 473506
7   MEYER GLITZENSTEIN & CRYSTAL
    1601 Connecticut Ave. N.W., Suite 700
8   Washington, D.C. 20009
9   (202) 588.5206 (phone)
    (202) 588.5049 (fax)
10
11  *Attorneys for plaintiffs Rebecca Cary, Debbie Boban, Misti Schmidt, Marcia Slackman, The*
    *Humane Society of the United States, Defenders of Wildlife, Kimya Institute, and Born Free USA*

12
13   **UNITED STATES DISTRICT COURT**
     **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14 _____

15   **REBECCA ANN CARY**,                    )
16   3608 Reposo Way,                         )
     Belmont, CA 94002,                       )
17                                            )
18   **DEBRA JOAN BOBAN**,                    )      **COMPLAINT FOR DECLARATORY**
     8003 Kelok Way,                          )      **AND INJUNCTIVE RELIEF**
19   Clayton, CA 94517,                       )
                                              )      **Administrative Procedure Act Case**
20   **MISTI MARIE SCHMIDT**,                 )
21   2635 Hillegass Avenue,                   )
     Apartment #5,                            )
22   Berkeley, CA 94704,                      )
                                              )
23   **MARCIA SLACKMAN**,                     )
24   490 Pebble Drive,                        )
     El Sobrante, CA 94803,                   )
25                                            )
26   **THE HUMANE SOCIETY OF THE**            )
     **UNITED STATES**,                       )
27   5301 Madison Avenue,                     )
     Suite 202,                               )
28   Sacramento, CA 95841,                    )

1  **DEFENDERS OF WILDLIFE**,                    )
   926 J Street,                                 )
2  Suite 522,                                    )
3  Sacramento , CA 95814,                        )
                                                 )
4  **KIMYA INSTITUTE**,                          )
   2320 Palm Avenue,                             )
5  San Mateo, CA 94403                           )
6                                                )
   **BORN FREE USA**,                            )
7  2040 Tunlaw Road, N.W.,                       )
   Washington, D.C. 20007,                       )
8                                                )
9  **BILL CLARK**,                               )
   16-B Rehov Eben Shaprut,                      )
10 Rehavia,                                      )
   Jerusalem 92478,                              )
11 Israel,                                       )
12                                               )
                    Plaintiffs,                  )
13                                               )
14 v.                                            )     **Civ. No. 3:05-cv-4363 (VRW)**
                                                 )
15 **DALE HALL**, Director,                      )
   Fish and Wildlife Service,                    )
16 1849 C Street N.W.,                           )
17 Washington, D.C., 20240,                      )
                                                 )
18 **GALE NORTON**, Secretary,                   )
   Department of the Interior,                   )
19 1849 C Street N.W.,                           )
20 Washington, D.C. 20240,                       )
                                                 )
21                    Defendants.                )
22 _____   )

23          1.      Plaintiffs challenge an unprecedented and highly controversial decision by the

24 United States Fish and Wildlife Service ("FWS" or "Service") to issue a regulation under section

25 10 of the Endangered Species Act ("ESA" or Act), 16 U.S.C. § 1531, et seq., that allows the

26

27 COMPLAINT FOR DECLARATORY                      EVANS & PAGE
   AND INJUNCTIVE RELIEF                          1 Market St., Spear Tower, S. 3600
28                              -2-               San Francisco, C.A. 94105

1   trophy hunting of endangered species, including the "canned hunting" of such species – i.e.,

2   enclosed areas where the animals cannot escape – on the grounds that allowing such activities

3   will create "economic incentives" for private ranches to breed more of the animals than "may" be

4   useful in the future for reintroducing the species into the wild, even though there currently is no

5   shortage of such animals in captivity at zoos and sanctuaries.  The specific regulation involves

6   the highly imperiled scimitar-horned oryx, addax, and dama gazelle – antelopes that are native to

7   the desert and semi-desert regions of northern Africa, that are all on the verge of extinction

8   primarily due to trophy hunting and destruction of their habitat.

9

10         2.       The new regulation will allow the trophy hunting of antelopes captive-bred in the

11  United States, and the transport and sale of live antelopes, their gametes, and sport-hunted

12  trophies in interstate and foreign commerce – activities that are all otherwise expressly prohibited

13  by section 9 of the ESA, 16 U.S.C. § 1538.  The FWS issued this unprecedented regulation in

14  violation of the plain language of the ESA, which only grants the Service the authority to issue

15  permits for activities that will themselves "enhance the propagation or survival of the species,"

16  and only on a case-by-case basis after providing the public notice and an opportunity for

17  comment on "each" such application for a permit and after the agency has made certain

18  statutorily mandated findings.  16 U.S.C. § 1539(a), (c), (d).  In issuing the regulation the FWS

19  also violated section 7 of the ESA, 16 U.S.C. § 1536(a)(2), by failing to "insure" that its actions

20  are "not likely to jeopardize the continued existence" of these endangered species by contributing

21  to the killing and illegal trade in wild animals, and the FWS violated the requirements of the

22  National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., by failing to consider

23

24

25

26

27  COMPLAINT FOR DECLARATORY            EVANS & PAGE
28  AND INJUNCTIVE RELIEF                1 Market St., Spear Tower, S. 3600
                            -3-          San Francisco, C.A. 94105

1  several alternative courses of action, failing to consider certain environmental effects of its

2  action, and failing to prepare an Environmental Impact Statement ("EIS") regarding this

3  extremely novel approach to "conserving" endangered species under the ESA.

### JURISDICTION AND VENUE

4

5

6  3.      This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 (federal

7  question).  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e).

### INTRADISTRICT ASSIGNMENT

8

9

10  4.      Pursuant to Civil L.R. 3-2(d), assignment is appropriate in the San Francisco or

Oakland Divisions because many of the plaintiffs reside in this district and no real property is at

11

12  issue in this action.

### PARTIES

13

14  5.      Plaintiff Rebecca Cary is a resident of Belmont, California, located in San Mateo

15

County.  Ms. Cary is a member of The Humane Society of the United States ("The HSUS"), and

16

17  has been involved in protecting domestic animals and wildlife since her childhood.  She is the

18  founding member of Students Against Animal Suffering ("SAAS"), a student group at the

19  University of California San Diego, which works on wildlife and animals in research issues.  To

20

21  stay informed about animal issues, Ms. Cary reads The HSUS website nearly everyday, and uses

it as a valuable resource on animal issues in which she is involved.  Ms. Cary disseminates this

22

23  information to her organization, and SAAS uses this and other HSUS publications, to inform

24  students about current animal issues.  In addition, Ms. Cary receives weekly email alerts from

25  The HSUS, which often feature endangered species and other wildlife issues including trophy

26

27  COMPLAINT FOR DECLARATORY                    EVANS & PAGE
   AND INJUNCTIVE RELIEF                        1 Market St., Spear Tower, S. 3600
28                                   -4-        San Francisco, C.A. 94105

hunting issues, and which offer HSUS members the opportunity to take action on issues to benefit animals.  Ms. Cary often responds to these action alerts.  She also uses the information provided by The HSUS to write letters to her Senators and to provide information on these issues to her local newspaper.  Ms. Cary also regularly reads The HSUS quarterly newsletter, <u>All Animals</u>, which features stories about, and photographs of, endangered and rare species from around the world, including the endangered dama gazelle.

6.     The FWS's unlawful promulgation of a regulation that permits the direct taking of endangered, scimitar-horned oryx, addax, and dama gazelle, as well as other activities that are otherwise prohibited by section 9 of the ESA, injures Ms. Cary.  By creating a blanket exemption from the process mandated by section 10 of the ESA, defendants have violated Ms. Cary's statutory right to obtain the information required for "each" application for a section 10 permit, and have denied her the opportunity to participate in that process, to which she is also entitled under section 10.  As a result, Ms. Cary will neither be able to be fully informed or to inform SAAS about information concerning the trophy hunting and canned hunting, transportation, sale, and export of scimitar-horned oryx, addax, and dama gazelle, nor will she have the opportunity to provide information to the FWS concerning such activities.  Ms. Cary is also harmed by defendants' actions as a member of The HSUS, because, as a result of the FWS's action, more of her membership dollars will have to be dedicated to obtaining information on these antelopes, when such information should be made readily available to the public under section 10 of the ESA.  Ms. Cary's injuries will be redressed if plaintiffs prevail in this action, because, as a result, the FWS will be required under section 10 of the ESA to publish in the Federal Register each

application for an exemption regarding the antelopes, and Ms. Cary will receive such notice, as well as an opportunity to comment on each such application, and she will also receive notice of the FWS's "findings" as required by section 10 before the agency issues any such permit. Such a ruling will also ensure that The HSUS will not have to dedicate its resources to finding alternative ways to obtain such information.

7. Plaintiff Debra Boban is a resident of Clayton, California, located in Contra Costa County, and she is also a member of The HSUS. Ms. Boban has an interest in protecting animal welfare and wildlife, and she is particularly concerned about "canned hunting" – i.e., the "sport" by which exotic animals are placed in enclosed areas so they cannot escape and are then shot for their "trophy" heads and other body parts. Ms. Boban has volunteered at a wildlife rehabilitation center near her home, and is a member of many animal protection organizations, in her efforts to protect animals from the adverse impacts of hunting. To stay informed on issues affecting animals, including those that are endangered, Ms. Boban regularly reads The HSUS quarterly newsletter, All Animals, a publication that often features stories about, and photographs of, endangered and rare species from around the world, including the endangered dama gazelle. In addition, Ms. Boban also receives and regularly responds to weekly email alerts from The HSUS, which often feature endangered species and other wildlife issues, and which offer HSUS members the opportunity to take action on issues with consequences for animals. She also regularly reads The HSUS website, which is constantly updated with new information and ways that HSUS members can take action to assist animals.

1        8.     The FWS's unlawful promulgation of a regulation that permits the direct taking of

2   endangered, scimitar-horned oryx, addax, and dama gazelle, as well as other activities that are

3   otherwise prohibited by section 9 of the ESA, injures Ms. Boban.  By creating a blanket

4   exemption from the process mandated by section 10 of the ESA, defendants have violated Ms.

5   Boban's statutory right to obtain the information required for "each" application for a section 10

6   permit, and they have denied her the opportunity to participate in that process, to which she is

7   also entitled under section 10.  As a result, Ms. Boban will neither be able to be fully informed

8   about the trophy hunting and canned hunting, transportation, sale, and export of scimitar-horned

9   oryx, addax, and dama gazelle, nor will she have the opportunity to provide information to the

10   FWS concerning such activities.  Ms. Boban is also harmed by defendants' actions as a member

11   of The HSUS, because more of her membership dollars will have to be dedicated to obtaining

12   information on these antelopes, when such information should be made readily available to the

13   public under section 10 of the ESA.  These injuries will be redressed if plaintiffs prevail in this

14   action, because, as a result, the FWS will be required under section 10 of the ESA to publish in

15   the Federal Register each application for an exemption regarding the antelopes, and Ms. Boban

16   will receive such notice, as well as an opportunity to comment on each such application, and she

17   will also receive notice of the FWS's "findings" as required by section 10 before the agency

18   issues any such permit.  Such a ruling will also ensure that The HSUS will not have to dedicate

19   its resources to finding alternative ways to obtain such information.

20        9.     Plaintiff Misti Schmidt is a resident of Berkeley, California, located in Alameda

21   County and she is a member of The HSUS.  Ms. Schmidt has been actively involved in

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

EVANS & PAGE
1 Market St., Spear Tower, S. 3600
-7-     San Francisco, C.A. 94105

protecting animals and endangered wildlife for many years.  She is also the External Vice

President of the Animal Law Society at the University of California Berkeley where she attends

law school.  Her organization frequently distributes information from The HSUS to fellow

students through tabling and emails, and it also sponsors speakers on current animal issues, such

as the illicit trade in wildlife.  Last summer, Ms. Schmidt worked on endangered species issues

as an intern, and helped draft and litigate petitions for listing and critical habitat designations.  In

order for her and her organization to stay informed on issues affecting animals, including those

that are endangered, Ms. Schmidt receives weekly email alerts from The HSUS, which often

feature endangered species and other wildlife issues, including trophy hunting issues, and which

offer HSUS members the opportunity to take action on issues to benefit animals.  Ms. Schmidt

takes action in response to nearly every such alert, including those on wildlife issues.  Ms.

Schmidt also receives and reads The HSUS quarterly newsletter, <u>All Animals</u>, which often

features stories and photographs of endangered and rare species from around the world, including

the endangered dama gazelle.  Ms. Schmidt regularly accesses The HSUS website, which she

uses as a resource for writing papers and staying informed on current animal issues.

      10.    The FWS's unlawful promulgation of a regulation that permits the direct taking of

endangered, scimitar-horned oryx, addax, and dama gazelle, as well as other activities that are

otherwise prohibited by section 9 of the ESA, injures Ms. Schmidt.  By creating a blanket

exemption from the process mandated by section 10 of the ESA, defendants have violated Ms.

Schmidt's statutory right to obtain the information mandated for "each" application for a section

10 permit, and they have denied her the opportunity to participate in that process, to which she is

also entitled under section 10.  As a result, Ms. Schmidt will neither be able to be fully informed concerning the trophy hunting and canned hunting, transportation, sale, and export of scimitar-horned oryx, addax, and dama gazelle, nor will she have the opportunity to provide information to the FWS concerning such activities.  Ms. Schmidt is also harmed by defendants' actions as a member of The HSUS, because more of her membership dollars will have to be dedicated to obtaining information on these antelopes, when such information should be made readily available to the public under section 10 of the ESA.  These injuries will be redressed if plaintiffs prevail in this action, because, as a result, the FWS will be required under section 10 of the ESA to publish in the Federal Register each application for an exemption regarding the antelopes, and Ms. Schmidt will receive such notice, as well as an opportunity to comment on each such application, and she will also receive notice of the FWS's "findings" as required by section 10 before the agency issues any such permit.  Such a ruling will also ensure that The HSUS will not have to dedicate resources to alternative ways to obtain such information.

11.     Plaintiff Marcia Slackman is a resident of El Sobrante, California, located in Contra Costa County.  Ms. Slackman is employed by The HSUS as the Major and Planned Gifts Officer of the West Coast Region, with the responsibility of informing donors about The HSUS's programs, and facilitating their gifts to The HSUS for its work on animal protection issues.  Ms. Slackman has been involved for many years in protecting both international and domestic wildlife.  She has been active in several California campaigns to protect cougars, bears, and endangered species in the San Francisco Bay, and has lobbied at the state and federal level, using information she received from The HSUS.  To stay informed on issues affecting animals, and to

1  share this information with potential and current HSUS donors, Ms. Slackman receives weekly

2  email alerts from The HSUS that often feature endangered species and other wildlife issues,

3  including trophy hunting issues.  Ms. Slackman regularly informs HSUS's donors about these

4  emails, and she also responds to these action alerts herself.  Ms. Slackman also receives, reads,

5  and distributes HSUS newsletters to donors, and she receives numerous internal emails and press

6  releases from The HSUS staff regarding wildlife issues.  Ms. Slackman also regularly reads The

7  HSUS website, which is routinely updated with new information on animal issues.  She uses the

8  website and HSUS staff as a resource to answer her donors' substantive questions regarding

9  animals and endangered species, and for writing funding proposals.

10          12.     The FWS's unlawful promulgation of a regulation that permits the direct taking of

11  endangered, scimitar-horned oryx, addax, and dama gazelle, as well as other activities that are

12  otherwise prohibited by section 9 of the ESA, injures Ms. Slackman.  By creating a blanket

13  exemption from the process mandated by section 10 of the ESA, defendants have violated Ms.

14  Slackman's statutory right to obtain information mandated for "each" application for a section 10

15  permit, and they have denied her the opportunity to participate in that process, to which she is

16  also entitled under section 10.  As a result, Ms. Slackman will neither be able to be fully

17  informed concerning the trophy hunting and canned hunting, transportation, sale, and export of

18  scimitar-horned oryx, addax, and dama gazelle, nor will she have the opportunity to provide

19  information to the FWS concerning such activities.  These injuries will be redressed if plaintiffs

20  prevail in this action, because, as a result, the FWS will be required under section 10 of the ESA

21  to publish in the Federal Register each application for an exemption regarding the antelopes, and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
-10-

EVANS & PAGE
1 Market St., Spear Tower, S. 3600
San Francisco, C.A. 94105

1  Ms. Slackman will receive such notice, as well as an opportunity to comment on each such

2  application, and she will also receive notice of the FWS's "findings" as required by section 10

3  before the agency issues any such permit.

4          13.     Plaintiff The Humane Society of the United States ("The HSUS"), is a non-profit

5  membership organization with over 9 million members and constituents.  The HSUS brings this

6  action on its own institutional behalf and on behalf of its members.  The HSUS is dedicated to

7  protecting wild and domestic animals by actively opposing those projects, plans, and events that

8  result in the killing or cruel treatment of animals.  The HSUS also educates its members and the

9  public about the perils animals regularly face.  The HSUS invests considerable resources in its

10  effort to end the trophy hunting of threatened and endangered species in general, and the

11  inhumane practice of canned hunting of threatened and endangered species in particular.  The

12  HSUS also works to gain protections for endangered and exploited animals, and it regularly

13  responds to requests for public comments from federal, state, and local governments, and it

14  submits complaints, petitions, and other information regarding endangered and exploited animals

15  to such entities.  The HSUS's international branch works to eliminate illegal trade in wildlife and

16  to reduce threats to imperiled species, including by assisting in the development and enforcement

17  of various treaties and international agreements affecting animals and their habitat.

18          14.     Essential to this work is The HSUS's ability to obtain information from

19  governments, scientists, and investigators regarding issues affecting animals.  Thus, The HSUS

20  routinely gathers information on actions proposed by the U.S. and other governments that affect

21  endangered and threatened animals, and it specifically monitors applications for ESA permits for

exceptions from the statute's prohibitions and for sport hunted trophy imports and other activities.  The HSUS also informs its members and the public about proposed governmental actions that would impact endangered and exploited animals through various means, including electronic action alerts, The HSUS website, and various mailings, including its newsletter, and it provides information to and works with, the news media in an effort to further educate the public about these issues.  As a result, The HSUS's members routinely comment on such actions.

15.    The FWS's unlawful promulgation of a regulation that permits the direct taking of endangered scimitar-horned oryx, addax, and dama gazelle, as well as other activities that are otherwise prohibited by section 9 of the ESA, injures The HSUS and its members.  By creating a blanket exemption from the process mandated by section 10 of the ESA, defendants have violated The HSUS's and its members' statutory right to obtain the information mandated for "each" application for a section 10 permit, and they have denied The HSUS and its members the opportunity to participate in that process, to which they are also entitled under section 10.  As a result, The HSUS will not be able to be keep its members fully informed concerning the trophy hunting and canned hunting, transportation, sale, and export of scimitar-horned oryx, addax, and dama gazelle for commercial purposes, because defendants are depriving The HSUS of its ability to obtain and disseminate this information through its action alerts, newsletter, and website, and defendants are also depriving The HSUS and its members of the opportunity to provide information to the FWS concerning such activities.  The HSUS and its members are also harmed by defendant's actions, because The HSUS will have to spend financial and other resources pursuing alternative sources of information regarding actions taken with respect to the antelopes,

1   when such information should be made readily available to the public under section 10 of the

2   ESA.  The HSUS's injuries will be redressed if plaintiffs prevail, because, as a result, the FWS

3   will be required under section 10 of the ESA to publish in the Federal Register each application

4   for an exemption regarding the antelopes, and The HSUS will receive such notice, as well as an

5   opportunity to comment on each such application, and it will also receive notice of the FWS's

6   "findings" as required by section 10 before the agency issues any such permit.  Such a ruling will

7   also ensure that The HSUS will not have to dedicate its resources to alternative ways to obtain

8   such information.

9        16.     Plaintiff Defenders of Wildlife ("Defenders") is a national nonprofit organization

10  with more than 480,000 members and supporters across the nation.  Defenders brings this action

11  on its own institutional behalf and on behalf of its members.  Defenders is dedicated to the

12  protection and restoration of all wild animals and plants in their natural communities.  Defenders

13  has invested considerable organizational resources in ensuring that species are listed under the

14  ESA, and that activities undertaken with respect to listed species adhere to the requirements of

15  the Act.  Accordingly, Defenders closely follows and regularly comments on applications for

16  permits under the ESA.  Defenders also works on international conservation issues involving the

17  commercial exploitation of, and trade in, threatened and endangered wildlife, including by

18  working through a number of multilateral environmental agreements to ensure that policy

19  decisions adequately protect wildlife and biological diversity, and to prevent governments from

20  weakening protections for the global environment.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
                    -13-

EVANS & PAGE
1 Market St., Spear Tower, S. 3600
San Francisco, C.A. 94105

17.     Essential to this work is Defenders ability to obtain information from governments, scientists, and investigators regarding these issues.  Thus, Defenders regularly obtains information from the U.S. government about proposed actions and policies, and the research and information pertaining to those proposals, that effect endangered species and their habitats, including applications for permits under the ESA.  Defenders uses this information to provide comments on, and submit complaints and other information regarding, legislative and administrative agency actions, as well as to keep its members and the public informed about proposals that effect imperiled species, their habitats, and biological diversity.  Defenders regularly informs its members and the public about all of these matters, by sending out action alerts by electronic mail, posting information on its website, publishing a newsletter, compiling detailed reports explaining specific conservation issues and problems, and providing information to, and working with, the news media to further educate the public about these issues.  As a result, Defenders' members regularly comment on proposed agency actions affecting wildlife and biological diversity.

18.     The FWS's unlawful promulgation of a regulation that permits the direct taking of endangered, scimitar-horned oryx, addax, and dama gazelle, as well as other activities that are otherwise prohibited by section 9 of the ESA, injures Defenders and its members.  By creating a blanket exemption from the process mandated by section 10 of the ESA, defendants have violated Defenders' and its members' statutory right to obtain the information mandated for "each" application for a section 10 permit, and they have denied Defenders and its members the opportunity to participate in that process, to which they are also entitled under section 10.  As a

result, Defenders will neither be able to be keep its members fully informed concerning the

trophy hunting, transportation, sale, and export of scimitar-horned oryx, addax, and dama gazelle

for commercial purposes, because defendants are depriving Defenders of its ability to obtain and

disseminate through its action alerts, newsletter, and website, nor will Defenders or its members

have the opportunity to provide information to the FWS concerning such activities.  Defenders

and its members are also harmed by defendant's actions, because Defenders will have to spend

financial and other resources pursuing alternative sources of information regarding actions taken

with respect to these antelope species when such information should be made readily available to

the public under section 10 of the ESA.  Defenders' injuries will be redressed if plaintiffs prevail,

because, as a result, the FWS will be required under section 10 of the ESA to publish in the

Federal Register each application for an exemption regarding the antelopes, and Defenders will

receive such notice, as well as an opportunity to comment on each such application, and it will

also receive notice of the FWS's "findings" as required by section 10, before the agency issues

any such permit.  Such a ruling will also ensure that Defenders will not have to dedicate its

resources to finding alternative ways to obtain such information.

19.     Plaintiff the Kimya Institute ("Kimya") is a Northern California-based non-profit

animal welfare organization that was founded to improve the standards of care for captive wild

animals, and to promote awareness of the growing trade in wild animals.  Kimya's primary

function is to manage the Captive Wild Animal Protection Coalition ("CWAPC") – a coalition of

animal protection groups, zoo professionals, and sanctuary operators working to bring an end to

the trade in wild animals as pets, and to improve the standards of care for captive wild animals.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
                                    -15-

EVANS & PAGE
1 Market St., Spear Tower, S. 3600
San Francisco, C.A. 94105

As a result of managing CWAPC, Kimya spends time monitoring proposals by various federal, state, and local governmental agencies that affect wild animals in captivity, obtaining information on such proposals, and informing the coalition and its members about these proposals through the CWAPC website.  Kimya also submits comment letters, petitions, and other responses to these proposals to various governmental entities with jurisdiction over wild animals in captivity.

20.     The FWS's unlawful promulgation of a regulation that permits the direct taking of endangered, scimitar-horned oryx, addax, and dama gazelle, as well as other activities that are otherwise prohibited by section 9 of the ESA, injures Kimya and its members.  By creating a blanket exemption from the process mandated by section 10 of the ESA, defendants have violated Kimya's and its members' statutory right to obtain information mandated for "each" application for a section 10 permit, and they have denied Kimya and its members the opportunity to participate in that process to which they are also entitled under section 10.  As a result, Kimya will not be able to be keep its members fully informed concerning the trophy hunting and canned hunting, transportation, sale, and export of scimitar-horned oryx, addax, and dama gazelle for commercial purposes because defendants are depriving Kimya of its ability to obtain and disseminate this information through its action alerts, newsletter, and website, nor will Kimya or its members have the opportunity to provide information to the FWS concerning such activities. Kimya's injuries will be redressed if plaintiffs prevail, because, as a result, the FWS will be required under section 10 of the ESA to publish in the Federal Register each application for an exemption regarding these antelope species, and Kimya will receive such notice, as well as an

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
                                                    -16-

EVANS & PAGE
1 Market St., Spear Tower, S. 3600
San Francisco, C.A. 94105

1    opportunity to comment on each such application, and it will also receive notice of the FWS's

2    "findings" as required by section 10 before the agency issues any such permit.

3        21.    Plaintiff Born Free USA ("Born Free") is a non-profit organization and a

4    companion group to the United Kingdom-based Born Free Foundation.  Born Free was founded

5    to protect animals and conserve threatened and endangered species, with a specific emphasis on

6    keeping wild animals in their native habitats.  The organization works to prevent cruelty to

7    animals in circuses, zoos, and other captive situations.  Additionally, Born Free works to prevent

8    the over-exploitation of wildlife in international trade, including curtailing the international and

9    often illegal trade in sport hunted trophies, and opposing the "canned hunting" of animals.  Born

10   Free also serves on the Species Survival Network Trophy Hunting Working Group, which

11   monitors export quotas and proposals for trophy exports under the Convention on International

12   Trade in Endangered Species of Flora and Fauna ("CITES").  In addition, the President of Born

13   Free, Will Travers, is a member of the World Conservation Union ("IUCN")  Reintroduction

14   Specialist Group, which sets standards for the reintroduction of animals into the wild, and Mr.

15   Travers has had the opportunity to view the dama gazelle in the wild.  Born Free routinely

16   comments on proposed actions that affect threatened and endangered species, and it requests

17   information on these proposals from the U.S. government and other governmental entities.  Born

18   Free also regularly updates its website with alerts for its members and, in partnership with Born

19   Free UK, has a newsletter, and sends out action alerts to its members informing them about

20   proposed activities by the U.S. and other governments that effect imperiled animals.

22.     The FWS's unlawful promulgation of a regulation that permits the direct taking of endangered, scimitar-horned oryx, addax, and dama gazelle, as well as other activities that are otherwise prohibited by section 9 of the ESA, injures Born Free and its members.  By creating a blanket exemption from the process mandated by section 10 of the ESA, defendants have violated Born Free's and its members' statutory right to obtain the information mandated for "each" application for a section 10 permit, and they have denied Born Free and its members the opportunity to participate in that process to which they are also entitled under section 10.  As a result, Born Free will not be able to be keep its members fully informed concerning the trophy hunting and canned hunting, transportation, sale, and export of scimitar-horned oryx, addax, and dama gazelle for commercial purposes, because defendants are depriving Born Free of its ability to obtain and disseminate this information through its action alerts, newsletter, and website, nor will Born Free or its members have the opportunity to provide information to the FWS concerning such activities.  Born Free and its members are also harmed by defendant's actions, because Born Free must spend financial and other resources pursuing alternative sources of information regarding actions taken with respect to the antelopes, when such information should be made readily available to the public under section 10 of the ESA.  Born Free's injuries will be redressed if it prevails, because, as a result, the FWS will be required under section 10 of the ESA to publish in the Federal Register each application for an exemption regarding the antelopes, and Born Free will receive such notice, as well as an opportunity to comment on each such application, and it will also receive notice of the FWS's "findings" as required by section 10

before the agency issues any such permit.  Such a ruling will also ensure that Born Free will not have to dedicate resources to alternative ways to obtain such information.

23.     Plaintiff Bill Clark is a U.S. citizen and a wildlife biologist with a Ph.D. in eco-ethology, and he is currently working for the Department of Law Enforcement at the Israel Nature and Parks Authority.  Dr. Clark is also a member of the Interpol Working Group on Wildlife Crimes, and he regularly serves on the Israeli delegation to the Convention on International Trade in Endangered Species of Flora and Fauna ("CITES").  For twenty-five years, Dr. Clark has been working to conserve and reintroduce into the wild the critically endangered scimitar-horned oryx and addax, and he has been doing the same work for ten years with respect to the dama gazelle.  Dr. Clark's efforts have included the reintroduction of eight scimitar-horned oryx in 1999 from Israel's Hari-Bar Reserve and a French zoo to Senegal – which now has a population of 38 oryxes that reside in two reserves, the Guembeul Fauna and the Ferlo.  Dr. Clark has worked tirelessly to gain funding for this and other programs for these species, which desperately need resources such as fences and other anti-poaching protections from hunters.

24.     Dr. Clark has both professional and personal interests in the conservation, protection, and reestablishment of the scimitar-horned oryx, addax, and dama gazelle in the wild that will be impaired as a result of the FWS's actions in issuing the new exemption for captive-bred antelopes.  He receives great pleasure and enjoyment from excursions to observe the addax and dama gazelle in the wild and from viewing the reintroduced scimitar-horned oryxes in Senegal, and to researching and working on reintroduction programs to ensure that all of these antelope species will persist in the wild in the future.  Dr. Clark's efforts to preserve and recover

these species are harmed by the FWS's new exemption for captive-bred antelopes, which undermines true conservation efforts for these species – such as those to which Dr. Clark is devoted.  Based on his professional expertise and experience, Dr. Clark believes that sport hunting is one of the primary factors that has contributed, and continues to contribute, to the decline of these species in the wild, and that sending the signal that hunting of these imperiled animals in the U.S. is acceptable will only result in additional hunters traveling to these species' native ranges in order to obtain a trophy from the wild.  As a result, the conservation efforts by the range countries, including those in which Dr. Clark is involved, will be further impeded, as will the concomitant opportunities to view these already greatly imperiled animals in the wild, including Dr. Clark's own such opportunities.  Dr. Clark's injuries will be redressed if plaintiffs prevail, because the broad exemption for captive-bred antelopes will be set aside, and hence will not risk further decline of the species in the wild, nor dilute legitimate conservation efforts in which he and others are involved.

25.     Defendant Dale Hall is the Director of the Fish and Wildlife Service and has been delegated responsibility by the Secretary of the Department of the Interior for ensuring compliance with the Endangered Species Act, 16 U.S.C. § 1531 et seq., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq.

26.     Defendant Gale Norton is the Secretary of the Department of the Interior and has ultimate authority for decisions issued under the ESA and NEPA.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
-20-

EVANS & PAGE
1 Market St., Spear Tower, S. 3600
San Francisco, C.A. 94105

**STATUTORY FRAMEWORK AND FACTS GIVING RISE
TO PLAINTIFFS' CLAIMS FOR RELIEF**

**A.**     **Statutory and Regulatory Framework**

     **1.**     **The Endangered Species Act**

    27.     The ESA was enacted because of Congress' concern that species of fish, wildlife, and plants "have been so depleted in numbers that they are in danger of or threatened with extinction." 16 U.S.C. § 1531(a). The statute pledges the United States "as a sovereign state in the international community to conserve to the extent practicable the various species of fish and wildlife and plants facing extinction," and it provides that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of [the Act]." 16 U.S.C. § 1531(c).

    28.     Under the ESA "conserve" and "conservation" mean "the use of all methods and procedures which are necessary to bring any endangered species . . . to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3). The Act provides that such methods may include the "regulated taking" of endangered species only "in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved." Id.

    29.     The ESA defines an "endangered species" as "any species which is in danger of extinction." 16 U.S.C. § 1532(6).

    30.     A species must be listed as endangered if the Service finds that "any one or a combination of the following factors" are present: "(1) present or threatened destruction, modification, or curtailment of [the species'] habitat or range;" (2) "overutilization for

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

EVANS & PAGE
1 Market St., Spear Tower, S. 3600
San Francisco, C.A. 94105

-21-

1    commercial, recreational, scientific, or educational purposes;" (3) "disease or predation;" (4) "the

2    inadequacy of existing regulatory mechanisms;" or (5) "other natural or manmade factors

3    affecting its continued existence."  16 U.S.C. § 1533(a)(1).

4        31.    A "population" is defined as a group of animals that are in "common spatial

5    arrangement that interbreed when mature."  50 C.F.R. § 17.3.

6

7        32.    Section 9 of the ESA prohibits the "taking" of any endangered species.  16 U.S.C.

8    § 1538(a).  The ESA defines the term "take" to include "harass, harm, pursue, hunt, shoot,

9    wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. §

10   1532(19).

11

12       33.    Section 9 further provides that it is unlawful to "possess, sell, deliver, carry,

13   transport, or ship" any endangered species that is unlawfully taken.  16 U.S.C. § 1538(a).

14   Section 9 also makes it unlawful to "deliver, receive, carry, transport, or ship in interstate

15   commerce . . . in the course of a commercial activity" any endangered species.  16 U.S.C. §

16   1538(a).

17

18       34.    These prohibitions apply to endangered animals bred in captivity, as well as to

19   those in the wild, unless a lawful section 10 permit has been issued by the FWS.

20

21       35.    Section 10(a)(1)(A) of the ESA authorizes the FWS to issue a "permit" for

22   any act that is otherwise prohibited by section 9, but only if such act is "for scientific

23   purposes or to enhance the propagation or survival of the affected species."  16 U.S.C. §

24   1539(a)(1)(A).

25

26

27   COMPLAINT FOR DECLARATORY              EVANS & PAGE
     AND INJUNCTIVE RELIEF                  1 Market St., Spear Tower, S. 3600
28                          -22-            San Francisco, C.A. 94105

36.     Section 10 further provides that the FWS "shall publish notice in the Federal Register of each application for an exemption or permit which is made under [section 10]," 16 U.S.C. § 1539(c), and requires that "[e]ach notice shall invite the submission from interested persons, within thirty days after the date of the notice, of written data, views or arguments with respect to the application . . .." Id.  Section 10 also mandates that "[i]nformation received by the [FWS] as a part of any application shall be available to the public as a matter of public record at every stage of the proceeding." Id.

37.     The FWS may grant exceptions under section 10(a) "only if [it] finds and publishes . . . in the Federal Register that (1) such exceptions were applied for in good faith, (2) if granted and exercised will not operate to the disadvantage of such endangered species, and (3) will be consistent with the purposes and policy" of the Act.  16 U.S.C. § 1539(d).

38.     The FWS has issued regulations implementing section 10 of the ESA.  The regulations for obtaining permits for scientific purposes or for enhancement of the propagation or survival of the species are included at 50 C.F.R. § 17.22.

39.     The FWS has also issued regulations under the ESA that provide an exemption for certain activities prohibited by section 9 for "*Captive-bred wildlife*."  50 C.F.R. § 17.21(g). These regulations require that a facility register in order to participate in the program, have adequate expertise, facilities or other resources available to enhance the propagation or survival of the species, and submit an annual written report of activities undertaken with respect to endangered species among other things.  50 C.F.R. § 17.21(g)(2)-(3).  The Captive-Bred Wildlife program applies to foreign species listed under the ESA that are captive-bred in the U.S.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
-23-

EVANS & PAGE
1 Market St., Spear Tower, S. 3600
San Francisco, C.A. 94105

40.     On December 27, 1993, the FWS further amended the definition of "enhance the propagation or survival" to make clear that the Captive-bred Wildlife program is available only to entities engaged in legitimate breeding programs.  58 Fed. Reg. 68323, 68325 (December 27, 1993).  The Captive-Bred Wildlife program does not allow entities to kill endangered species for trophies, nor to transport dead animals or their parts in interstate or foreign commerce for commercial gain.

41.     Section 7(a)(2) of the ESA requires that, "in consultation with and with the Assistance of the [Service]," each federal agency shall "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species . . .."  16 U.S.C. § 1536(a)(2).  This requirement applies unless the Service has determined in writing that the proposed action "is not likely to adversely affect" a listed species.

42.     During consultation, the Service must consider "the best scientific and commercial data available . . . for an adequate review of the effects" the action may have on listed species.  50 C.F.R. § 402.14(d).  The Service must review the information it receives during consultations and all other relevant information, evaluate the status of the listed species, and issue a "biological opinion" detailing "how the agency action affects the species," 16 U.S.C. § 1536(b)(3)(A), and concluding whether the action is "likely to jeopardize" the continued existence of the species in violation of section 7.  50 C.F.R. § 402.14(g), (h).  If the action will result in a "take" of a listed species, the action may not go forward unless the Service issues an "incidental take" statement, which allows the "take" of a limited number of the species, if the

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
-24-

EVANS & PAGE
1 Market St., Spear Tower, S. 3600
San Francisco, C.A. 94105

1   federal agency undertakes certain other conservation measures on behalf of the species.  16

2   U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14.

3        43.     As explained in the Service's Handbook for Procedures for Conducting

4   Consultation Under Section 7, the Service may not determine that a proposed action is "not likely

5   to adversely affect" a listed species – and, therefore bypasses the formal consultation process – if

6   the proposed action allows the "take" of a listed species.  See Handbook for Procedures for

7   Conducting Consultation Under Section 7 at 3-12.

8

9                    **2.      The National Environmental Policy Act**

10       44.     The National Environmental Policy Act ("NEPA") is the nation's basic charter for

11  the protection of the environment.  NEPA makes it national policy to "use all practicable means

12  and measures . . .  to foster and promote the general welfare [and] to create and maintain

13  conditions under which [humans] and nature can exist in productive harmony."  42 U.S.C. §

14  4331(a).  NEPA directs the federal government to "recognize the worldwide and long-range

15  character of environmental problems," and to anticipate and prevent the decline of the "world

16  environment."  Id. § 4332(F).  NEPA's purposes are to "help public officials make decisions that

17  are based on [an] understanding of environmental consequences, and to take actions that protect,

18  restore, and enhance the environment."  40 C.F.R. § 1500.1(b)-(c).

19       45.     To accomplish these purposes, NEPA requires all agencies of the federal

20  government to prepare a "detailed statement" regarding all "major federal actions significantly

21  affecting the quality of the human environment."  42 U.S.C. § 4332(C).  This statement is

22  commonly referred to as an "Environmental Impact Statement" ("EIS").  NEPA further provides

23

24

25

26

27  COMPLAINT FOR DECLARATORY                    EVANS & PAGE
    AND INJUNCTIVE RELIEF                        1 Market St., Spear Tower, S. 3600
28                           -25-               San Francisco, C.A. 94105

that agencies "shall . . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." Id. § 4332(2)(E).

46.    An EIS must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) alternatives to the proposed action, (4) "the relationship between local short-term uses of [the] environment and the maintenance and enhancement of long-term productivity," and (5) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332.

47.    The Council on Environmental Quality ("CEQ") – an agency within the Executive Office of the President – has promulgated regulations implementing NEPA that are binding on all agencies, including the FWS. See 40 C.F.R. §§ 1500-1508.

48.    The CEQ regulations provide that, where the agency has not determined whether an EIS is required, it must generally prepare an "Environmental Assessment" ("EA") to determine whether the environmental effects of its proposed action are "significant" and thereby require the preparation of an EIS. 40 C.F.R. § 1501.4(b). In determining whether an action is "significant," the agency must consider "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial;" "[t]he degree to which the action may establish a precedent for future actions with significant effects or represent a decision in principle about a future consideration;" the degree to which the action "may adversely affect an endangered or threatened species;" the degree to which the action "affects public health or

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
                                        -26-

EVANS & PAGE
1 Market St., Spear Tower, S. 3600
San Francisco, C.A. 94105

1   safety;" and whether "the action threatens a violation of Federal . . . law or requirements

2   imposed for the protection of the environment." 40 C.F.R. § 1508.27(b).

3       49.     If, as a result of the EA, the agency concludes that an EIS is not required, the

4   agency issues a Finding of No Significant Impact ("FONSI"), 40 C.F.R. § 1501.4(e), which

5   

6   presents the reasons why the action "will not have a significant effect on the human environment

7   . . .." 40 C.F.R. § 1508.13.

8       **B.     Facts Giving Rise To Plaintiffs' Claims**

9       **1.     The Three Antelope Species**

10

11      50.     The scimitar-horned oryx, addax, and dama gazelle are all native to the Sahelo-

12  Saharan region of northern Africa. This region is larger in size than the United States and

13  consists of not only the immense, waterless expanse of the Sahara desert, but also the semi-desert

14  regions along the northern and southern margins of the Sahara. The southern narrow transition

15  land between the Sahara and the more fertile regions of tropical Africa is the Sahel.

16

17      51.     The Sahara is characterized by dunes, stony steppes, and the occasional oasis,

18  while the Sahel alternates between grassland and thorn scrub.

19      52.     The scimitar-horned oryx (*Oryx dammah*) is a light colored antelope with a dark

20  reddish-brown neck and chest and a dark stripe over the eyes. Standing roughly four feet high at

21  the shoulder, the species takes its name from the long, curving horns that arc dramatically over its

22  back, and can reach over three feet in length.

23

24      53.     Historically, the scimitar-horned oryx ranged throughout the desert and semi-

25  desert regions of northern Africa. Although the species' range included a dozen countries

26

27  COMPLAINT FOR DECLARATORY          EVANS & PAGE
    AND INJUNCTIVE RELIEF              1 Market St., Spear Tower, S. 3600
28                          -27-       San Francisco, C.A. 94105

spanning the whole of North Africa – Morocco, Tunisia, Algeria, Libya, Egypt, Sudan, Mauritania, Mail, Chad, Niger, Burkina Faso, and Senegal – the oryx typically relied on the marginal sub-desert habitats to the north and south of the Sahara.

54.     The scimitar-horned oryx's reliance on sub-desert habitats resulted in sparsely distributed, migratory herds that were highly vulnerable to hunting and exploitation by humans and localized habitat loss.

55.     The scimitar-horned oryx is currently believed to be extinct in the wild.  Over hunting of scimitar-horned oryx and habitat loss are the principal drivers of the species extinction in the wild and are the principle threats to its future recovery.

56.     Scimitar-horned oryx have been re-established in protected areas in certain countries within their historic range such as Senegal.

57.     The addax (*Addax nasomaculatus*) is a sand-colored antelope with a brown tuft of hair on the forehead and a white stripe across the nose.  Addax are about four feet tall at the shoulder and have large, splayed hooves for walking in sand.  Addax have lengthy horns that slant backwards and upwards in diagonals and can reach over three feet in length.

58.     The addax's historic range includes the deserts and semi-deserts of North Africa ranging from coast to coast.  The addax has a unique ability to utilize waterless areas in the heart of the Saharan desert.

59.     Excessive hunting of the addax throughout its range is the primary factor contributing to its decline and remains a serious threat to the survival of the species.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
                              -28-

EVANS & PAGE
1 Market St., Spear Tower, S. 3600
San Francisco, C.A. 94105

60.     While the addax historically ranged throughout Morocco, Tunisia, Algeria, Libya, Egypt, Mauritania, Mali, Chad, and Niger, the addax can be found in the wild today only in parts of Chad, Niger, and Mail.

61.     The dama gazelle (*Gazella dama*) is a white antelope with a reddish-brown neck with a white spot below the throat.  Dama gazelles can also have reddish-brown markings on their foreheads, backs, and legs.  Although smaller than the addax and scimitar-horned oryx, dama gazelles are among the tallest gazelles reaching between three and three and a half feet at the shoulder.  Their horns arch backwards and then forwards, but are short, reaching only about 17 inches in length.

62.     The historic range of the dama gazelle is northern Africa where it was common throughout the desert and semi-desert of the Sahelo-Saharan region.

63.     The species rapid and dramatic decline was driven principally by overhunting, exacerbated, in recent years, by habitat loss.  Hunting remains a serious threat to the survival of the species.

64.     Once common throughout both desert and semi-desert habitats of northern Africa, the dama gazelle has been extripated from seven of the twelve countries in its historic range.  Today remnant populations are scattered across Algeria, Chad, Mali, Niger, and Sudan.

65.     The females of all three Antelope species resemble the males, but have less prominently developed horns.

67.     The horns and unique marks of these species make them desirerable trophies for sport hunters.  All three species have declined as a result of uncontrolled and often illegal

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

EVANS & PAGE
1 Market St., Spear Tower, S. 3600
San Francisco, C.A. 94105

-29-

1    hunting.  The recent use of motor vehicles and modern weapons in hunting, as well as hunting by

2    non-residents have contributed to the continued decline of the three species.

3          68.    The World Conservation Union ("IUCN") has a program called the Species

4    Survival Commission, that assesses the conservation status of species on a global scale and

5    publishes what is known as the "Red List" which highlights the taxa threatened with extinction in

6    the hopes of promoting their conservation.  The IUCN considers the scimitar-horned oryx to be

7

8    extinct in the wild, the addax to be critically endangered, and the dama gazelle to be endangered.

9          **2.    Recovery And Reintroduction Efforts For The Scimitar-Horned**
           **Oryx, Addax, And Dama Gazelle**
10

11         69.    The scimitar-horned oryx was last seen in the wild in Chad in the 1990s.

12
     Reintroduction efforts for this species are ongoing in fenced areas in Morocco, Tunisia, and
13
     Senegal.
14

15         70.    While the addax still exists in the wild, it has been extirpated from portions of its

16   range.  Thus, the addax is being reintroduced into fenced areas in Morocco and Tunisia.

17         71.    The dama gazelle still exists in the wild, but is also being reintroduced into a

18   fenced area in Senegal.

19
           72.    The antelopes used in these reintroduction efforts have been supplied by
20
21   conservation breeding programs in Israel and Europe, as well as the range states themselves.

22         73.    Hunting of the scimitar-horned oryx, addax, and dama gazelle has impeded

23
     reintroduction efforts for these species in many areas, because the animals cannot be reintroduced
24
     into areas without adequate protections from hunters.  Since much of the hunting of the scimitar-
25

26

27   COMPLAINT FOR DECLARATORY              EVANS & PAGE
     AND INJUNCTIVE RELIEF                  1 Market St., Spear Tower, S. 3600
28                             -30-         San Francisco, C.A. 94105

horned oryx, addax, and dama gazelle is done illegally, the antelopes must generally be reintroduced into areas with fences and/or anti-poaching patrols.

74.     The IUCN has developed guidelines for the reintroduction of animals into the wild.  These guidelines recommend that animals with the closest possible match of genotype to the existing or extirpated wild population from the area be used for reintroduction.  This requires that genetic studies be undertaken before reintroduction.

75.     The guidelines also recommend that "previous causes of decline" should be "[i]dentifi[ed]" and "eliminat[ed]" or "reduc[ed]" before reintroduction occurs.

76.     An Action Plan for the Conservation and Restoration of Sahelo-Saharan Antelopes ("Action Plan") has been developed, which includes the scimitar-horned oryx, addax, and dama gazelle.  The Action Plan stresses that "[c]aptive breeding and reintroduction programmes for regional restoration of species should attempt to preserve distinct subspecies and geographic forms," including "respect[ing] the geographical variation of the species," and it recommends that a regional captive-breeding and reintroduction center be created in Niger.

77.     Genetic hybridization is the crossbreeding or mixing of different species of animals or plants.

**3.     Captive Breeding Of Antelopes In The United States**

78.     The scimitar-horned oryx, addax, and dama gazelle are bred in captivity in the U.S. by institutions, namely zoos, that are members of the American Zoological and Aquarium Association ("AZA").

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

EVANS & PAGE
1 Market St., Spear Tower, S. 3600
San Francisco, C.A. 94105

-31-

79.     Members of the AZA must participate in the Species Survival Plan ("SSP") for the species housed in their facilities, or can elect to participate in a Population Management Plan for species that do not have an SSP.

80.     The addax, scimitar-horned oryx, and the dama gazelle subspecies the mhorr gazelle each have SSPs.  These plans include managed breeding programs for the species that ensure genetic viability and attempt to preserve genetic lines from the wild.

81.     Members of the AZA also must abide by the acquisition and disposal policies of the association which prohibit the dissemination of any animals to organizations or individuals that allow the hunting of the animals or their offspring.

82.     Only one U.S. facility, the San Diego Zoo, has contributed any of these antelope species to wild reintroduction efforts.

### 4.     Trophy Hunting And Canned Hunting At U.S. Ranches

83.     The scimitar-horned oryx, addax, and dama gazelle have also been bred in captivity by private ranches.

84.     There is only one private ranch in the United States that is a member of an SSP – the David Bamberger Ranch in Johnson City, Texas.

85.     The remainder of the private ranches in the U.S. that breed scimitar-horned oryx, addax, and dama gazelle are not members of the SSPs for these animals.

86.     Animals such as the three antelope species that are not native to the U.S. and that are bred on private hunting ranches are typically referred to as "texazotics" – foreign species that are often bred to create the best trophies.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
                              -32-

EVANS & PAGE
1 Market St., Spear Tower, S. 3600
San Francisco, C.A. 94105

87.     Many of the private ranches offer "canned hunting" opportunities where trophy hunters can kill confined endangered species like the scimitar horned oryx, addax, and dama gazelle in fenced enclosures at feeding stations and watering holes where the animals are easy targets and have little or no chance of escape.

88.     Canned hunting has been condemned by several U.S. based hunting organizations as unsportsmanlike and unethical, because it does not allow for the "fair chase" of the animals.

89.     Trophy hunting and canned hunting ranches profit from the trophy hunting opportunities they provide for hunters to hunt these and other species for a fee.  According to the FWS the "average annual value of breeding stock and trophy sales ranges from $48,600 to $83,300" per ranch.  Trophy prices for these antelope species often reaching well above $2,500 dollars.  These ranches frequently also provide housing to trophy hunters, offer taxidermy services, and some will even "guarantee" a trophy to their clientele.

**5.      The FWS's Proposals To List The Scimitar-Horned Oryx, Addax, And Dama Gazelle As Endangered And To Create A Broad Exemption From ESA Prohibitions For These Animals That Are Captive Bred In The U.S.**

90.     On November 5, 1991, due to the precipitous decline in all three species, the FWS proposed to list the scimitar-horned oryx, addax, and dama gazelle as endangered under the ESA. 56 Fed. Reg. 56,491.

91.     On July 24, 2003 and November 26, 2003, the FWS re-opened the comment period on the proposed rule to list the three antelope species as endangered.  See 68 Fed. Reg. 43,706; 68 Fed. Reg. 66,395.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
                                              -33-

EVANS & PAGE
1 Market St., Spear Tower, S. 3600
San Francisco, C.A. 94105

92.     Sport hunting organizations and their members submitted comment letters to the FWS opposing the listing of these species as endangered on the grounds that the listing would prohibit the trophy hunting of these animals in the United States.  For example, the Exotic Wildlife Association wrote that owners of ranches "will start discontinuing their breeding programs with these species if listing is instituted," because of the paperwork necessary to register under the Captive-Bred Wildlife program, or to apply for permits under section 10 for the sale of sport hunted trophies, which make it more difficult to profit from these antelope species.

93.     In response, on February 1, 2005, the FWS issued a notice in the Federal Register of a proposed rule that would exempt the scimitar-horned oryx, addax, and dama gazelle, that are captive-bred in the United States, from certain prohibitions in section 9 of the ESA, if the species were listed as endangered under the Act ("Section 10 Exemption").  70 Fed. Reg. 5,117.  The FWS invited the public to comment on the proposed exemption.

94.     Specifically, the proposed Section 10 Exemption would allow any person under U.S. jurisdiction to "take; export or re-import; deliver, receive, carry, transport or ship in interstate or foreign commerce, in the course of a commercial activity; or sell or offer for sale in interstate or foreign commerce live wildlife, including embryos and gametes, and sport-hunted trophies of" the scimitar-horned oryx, addax, and dama gazelle without a separate section 10 permit when:  1) the activity "associated with the transfer" "contributes to increasing or sustaining captive population numbers or to potential reintroduction to range countries," 2) the animal was captive bred, 3) the export of the animals complies with the FWS's existing regulations, 4) the re-imported animal has a unique tattoo or other approved documentation, and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

-34-

EVANS & PAGE
1 Market St., Spear Tower, S. 3600
San Francisco, C.A. 94105

5) the facility maintains "accurate written records of activities . . .and make[s] those records accessible to Service agents for inspection at reasonable hours . . .." 70 Fed. Reg. 5,122.

95.     The FWS's stated justification for the Section 10 Exemption was that captive-breeding has contributed significantly to the propagation or survival of the scimitar-horned oryx, addax, and dama gazelle and thus, these antelopes are dependent on captive breeding, and activities associated with captive breeding – including sport hunting – for their survival.  The FWS concluded that, although sport hunting does not directly enhance the propagation or survival of these antelopes, it generates potential funds for such activities, relieves hunting pressure on wild populations, and absorbs surplus species.

96.     On February 1, 2005, the FWS also issued a draft Environmental Assessment ("EA") on the proposed Section 10 Exemption.

97.     The draft EA explained that the proposed rule is necessary because the existing "regulatory paragraphs implementing the Act" – i.e., section 10 and the Captive Bred Wildlife program – do not allow "the interstate or foreign commerce of sport-hunted trophies of U.S. captive-bred specimens in commercial activities."  The draft EA analyzed three alternatives – the proposed action, a proposal to include the scimitar-horned oryx, the addax, and the dama gazelle in the Captive-Bred Wildlife program, and a proposal to list the species as endangered without amending the FWS's regulations.

98.     On April 4, 2005, plaintiffs Defenders and The HSUS submitted extensive comments to the FWS opposing the proposed rule creating an exemption for captive-bred members of the species on the following grounds: (1) the FWS failed to provide any evidence

that creating the exemption would enhance the propagation or survival of the species in the wild; (2) the agency violated the plain language of section 10 of the ESA, which only gives the FWS authority to issue permits on a case-by-case basis, and requires notice, the opportunity to comment, the availability of application materials, and certain findings to be made before such exemptions from the prohibitions in section 9 may be permitted; (3) the FWS violated section 7 of the Act by failing to consult on the effects of the proposed rule; and (4) the FWS violated the National Environmental Policy Act in several respects including by failing to prepare an EIS on the proposal which is the first of its kind since the enactment of the ESA.

99.     On April 4, 2005 plaintiffs The HSUS, Defenders, and Born Free also submitted comments along with over 18 other animal protection and conservation organizations supporting the FWS's proposal to list the scimitar-horned oryx, addax, and dama gazelle as endangered, but opposing the FWS's proposal to exempt certain activities from the prohibitions of section 9 of the ESA with respect to the three antelope species.  These comments provided extensive analysis of the scientific and procedural flaws in the proposal.

100.    In July 2005, the FWS prepared a final Environmental Assessment for the Antelope Exemption.

101.    The final EA fails to consider numerous environmental impacts, fails to apply or analyze the "significance" factors contained in the CEQ regulations, and fails to consider several viable alternatives for the conservation of the antelopes.

102.    On August 9, 2005 the FWS signed a FONSI stating that the Section 10 Exemption "will have no discernible adverse effects" on the three antelopes species, native

1    wildlife or habitat, or human health.

2           **6.    The FWS's Final Regulations.**

3           103.    On September 2, 2005, the FWS listed the scimitar-horned oryx, addax, and dama

4    gazelle as endangered throughout their ranges under the ESA.  70 Fed. Reg. 52,319.

5

6           104.    With respect to the five listing factors, the FWS found that "habitat loss,"

7    "[u]ncontrolled killing" i.e., hunting or overutilization, "inadequate existing regulatory

8    mechanisms," and "natural factors such as drought and manmade factors that result in habitat

9    loss and uncontrolled killing" have all contributed to the decline of the three species.  The FWS

10   noted that "the wild populations of the three antelopes have declined drastically over the past 50

11   years."  70 Fed. Reg. at 52,321-52,322.

12

13          105.    The final rule recognizes that "[i]t would not be appropriate to list captive and

14   wild animals separately."  70 Fed. Reg. at 52,320.

15

16          106.    On September 2, 2005, the FWS also issued a final rule creating a blanket

17   exemption from certain prohibitions of section 9 for captive-bred specimens of these newly listed

18   species, including the direct killing, movement in the course of commercial activity, and sale of

19   these animals for the reasons stated in the notice for the proposed rule ("Section 10 Exemption").

20   70 Fed. Reg. 52,310.

21

22          107.    The final rule allows "any person subject to the jurisdiction of the United States"

23   to "take; export or re-import; deliver, receive, carry, transport or ship in interstate or foreign

24   commerce, in the course of a commercial activity; or sell or offer for sale in interstate or foreign

25   commerce live wildlife, including embryos and gametes, and sport-hunted trophies of" scimitar-

26

27   COMPLAINT FOR DECLARATORY                    EVANS & PAGE
     AND INJUNCTIVE RELIEF                        1 Market St., Spear Tower, S. 3600
28                                    -37-        San Francisco, C.A. 94105

horned oryx, addax, and dama gazelle without a permit under section 10 of the ESA.  70 Fed. Reg. at 52,318.  In order to do so, the person must demonstrate that: 1) the "activity is associated with the management or transfer of live wildlife, including embryos and gametes, or sport hunting in a manner that contributes to increasing or sustaining captive numbers or to potential reintroduction to range countries," 2) the animal "was captive-bred," 3) the animals are "managed in a manner that prevents hybridization of the species or subspecies," 4) the animals are "managed in a manner that maintains genetic diversity," 5) the export of the animals complies with existing regulations at 50 C.F.R. §§ 17.21(g)(4), 13, 14, & 23, 6) re-imported animals are "uniquely identified by a tattoo" or other documented mark, 7) the person maintains "accurate written records of activities . . . and makes those records accessible to Service officials for inspection," and 8) sport-hunted trophies only include "raw or tanned parts, such as bones, hair, head, hide, hooves, horns, meat, skull, rug, taxidermied head, shoulder, or full body mount, of a specimen that was taken by the hunter during a sport hunt for personal use." Id. at 52,318-319.

108.    The FWS failed to provide evidence that the rule will result in the propagation or enhancement of the survival of the antelopes in the wild.

109.    The FWS failed to provide any evidence that sport-hunting of these endangered antelopes in captivity relieves hunting pressures on the animals in the wild.

110.    The FWS failed to explain how the act of killing an endangered scimitar-horned oryx, addax, or dama gazelle itself contributes to the enhancement of the propagation or survival of the species in the wild.

111.    The FWS received 42 comment letters expressing support for the rule and 153 comments in opposition to the rule.

112.    In responding to comments, the FWS agreed "that captive-held animals may not qualify as populations as defined at 50 C.F.R. 17.3."  70 Fed. Reg. at 52,312.

113.    The FWS did not consult under section 7 of the ESA regarding the effects of the Section 10 Exemption on the endangered antelopes.

114.    The FWS's FONSI fails to explain why the Section 10 Exemption will not have any significant effects, as defined by NEPA.

## PLAINTIFFS' CLAIMS FOR RELIEF

### Claim One – Violations of Section 10 of the Endangered Species Act

115.    In issuing a regulation that allows certain activities to be undertaken with respect to the endangered scimitar-horned oryx, addax, and dama gazelle that are otherwise prohibited by section 9 of the ESA, without demonstrating that each of these activities themselves will "enhance the propagation or survival" of the endangered antelopes, defendants have violated section 10(a)(1)(A) of the Endangered Species Act.  16 U.S.C. § 1539(a)(1)(A).

116.    In issuing a regulation that allows certain activities to be undertaken with respect to the endangered scimitar-horned oryx, addax, and dama gazelle that are otherwise prohibited by section 9 of the ESA without a section 10 permit, defendants have violated the procedural requirements of section 10(c) of the ESA that they "shall publish notice in the Federal Register of each application for an exemption or permit which is made under this section," that "[e]ach notice shall invite the submission from interested parties, within thirty days after the date of the

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
                                              -39-

EVANS & PAGE
1 Market St., Spear Tower, S. 3600
San Francisco, C.A. 94105

notice, of written data, views, or arguments with respect to the application," and that "[i]nformation received by the Secretary as a part of any application shall be available to the public as a matter of public record at every stage of the proceeding." 16 U.S.C. § 1539(c). Defendants also violated section 10(d) of the ESA by failing to "find[] and publish[] [its] finding in the Federal Register that (1) such exceptions were applied for in good faith, (2) if granted and exercised will not operate to the disadvantage of such endangered species, and (3) will be consistent with the purposes and policy set forth in section 1531 of this title." 16 U.S.C. § 1539(d).

117.   In so violating the substantive and procedural mandates of section 10 of the Act, defendants have acted arbitrarily and capriciously, abused their discretion, and acted contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

118.   These violations of law have caused, and will continue to cause, plaintiffs' injuries as described in ¶¶ 5-24.

### Claim Two – Violations of Sections 7 of the Endangered Species Act

119.   By failing to consult on the impacts to the scimitar-horned oryx, addax, and dama gazelle from issuing the Section 10 Exemption, which allows certain activities that are otherwise prohibited by section 9 of the ESA to occur with respect to these animals, including the direct taking of the animals, defendants violated section 7(a)(2) of the ESA, 16 U.S.C. §§ 1536(a)(2).

120.   Accordingly, defendants have acted arbitrarily and capriciously, abused their discretion, and acted contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
                                        -40-

EVANS & PAGE
1 Market St., Spear Tower, S. 3600
San Francisco, C.A. 94105

121.    These violations of law have caused, and will continue to cause, plaintiffs'

injuries as described in ¶¶ 5-24.

### Claim Three – Violations Of The National Environmental Policy Act

122.    By issuing a regulation without properly analyzing its environmental effects,

preparing an Environmental Impact Statement, or considering a reasonable range of alternatives,

defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, and the

Council on Environmental Quality's implementing regulations.

123.    Accordingly, defendants have acted arbitrarily and capriciously, abused their

discretion, and acted contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C.

§ 706(2).

124.    These violations of law have caused, and will continue to cause, plaintiffs'

injuries as described in ¶¶ 5-24.

**WHEREFORE**, plaintiffs request that the Court issue an order:

(1)    declaring that defendants have violated the Endangered Species Act, the National

Environmental Policy Act, and the Administrative Procedure Act;

(2)    setting aside defendants' Section 10 Exemption and enjoining its implementation;

(3)    enjoining defendants from allowing any activities with respect to the endangered

scimitar-horned oryx, addax, and/or dama gazelle that are prohibited by section 9 of the

Endangered Species Act to occur without first issuing a permit in accordance with all of the

substantive and procedural requirements of section 10 of the ESA, as well as the FWS's

1    implementing regulations, and the requirements of section 7 of the ESA and NEPA;

2         (4)    awarding plaintiffs their costs and reasonable attorneys' fees; and

3         (5)    awarding plaintiffs any other relief that the Court may deem just and proper.

4

5                                     Respectfully submitted,

6

7                                     _____s/_____

8                                     COREY EVANS
                                      (CA Bar No. 218789)

9

10                                    _____s/_____

11                                    GENEVA PAGE
                                      (CA Bar No. 23563)

12
                                      EVANS & PAGE
13                                    One Market Street
                                      Spear Tower
14                                    Suite 3600
15                                    San Francisco, C.A. 94105
                                      (415) 293.8592
16

17                                    _____s/_____

18                                    KATHERINE A. MEYER
                                      (D.C. Bar No. 244301)
19

20                                    _____s/_____

21                                    TANYA SANERIB
                                      (D.C. Bar No. 473506)

22
                                      MEYER GLITZENSTEIN & CRYSTAL
23                                    1601 Connecticut Ave., N.W.
                                      Suite 700
24                                    Washington, D.C.  20009
                                      (202) 588.5206
25

26   Date:  October 26, 2005

27   COMPLAINT FOR DECLARATORY            EVANS & PAGE
     AND INJUNCTIVE RELIEF                1 Market St., Spear Tower, S. 3600
28                          -42-         San Francisco, C.A. 94105

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

_____s/_____

COREY EVANS
(CA Bar No. 218789)
EVANS & PAGE
One Market Street
Spear Tower
Suite 3600
San Francisco, C.A. 94105
(415) 293.8592

Date:  October 26, 2005